**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 02 B 02474 |
| | ) | |
| KMART CORPORATION, et al., | ) | |
| | ) | Hon. Susan Pierson Sonderby |
| | ) | |
| | ) | Adv. Nos. 04 A 00126, 04 A 00094, |
| | ) | 04 A 00087, 04 A 02898, 04 A 00158, |
| | ) | 04 A 02775, 04 A 02865, 04 A 02785, |
| | ) | 04 A 02874, 04 A 02102, 04 A 02436, |
| | ) | 04 A 02005, 04 A 02479, 04 A 00145, |
| Debtors. | ) | 04 A 01970, 04 A 02072, 04 A 02118, |
| | ) | 04 A 02395 |
| | ) | |

**MEMORANDUM OPINION**

This matter is before the court on numerous motions to dismiss the adversary complaints filed by Debtor Kmart Corporation in Adversary Proceedings Nos. 04 A 00126, 04 A 00094, 04 A 00087, 04 A 02898, 04 A 00158, 04 A 02775, 04 A 02865, 04 A 02785, 04 A 02874, 04 A 02102, 04 A 02436, 04 A 02005, 04 A 02479, 04 A 00145, 04 A 01970, 04 A 02072, 04 A 02118, and 04 A 02395, seeking to recover payments made to its "Critical Vendors," all as more fully set forth below.

**Background.**[1]

On January 22, 2002, Kmart Corporation and thirty-seven of its subsidiaries and affiliates filed voluntary Chapter 11 petitions in this court. Upon motion presented that same day, the cases were consolidated for administrative purposes.

Among the many other "first day" motions was a request for authority to obtain secured postpetition financing. An interim order was entered on January 22, 2002, authorizing borrowings of up to $1.15 billion and scheduling a final hearing for March 6, 2002. On that date, a final financing order was entered authorizing borrowings of up to $2 billion (the "DIP Financing Order").

The most controversial of the "first day" motions was Kmart's "Motion for Order Under 11 U.S.C. § 105(a) Authorizing the Payment of Prepetition Claims of Certain Critical Trade Vendors" (the "Critical Vendor Motion"). In that motion, Kmart sought authority to pay the prepetition claims of certain vendors deemed critical to the uninterrupted functioning of its business operations: 1) Fleming Companies, Inc., 2) Handleman Company, 3) egg and dairy vendors, and 4) "certain newspapers, printers, paper suppliers and other vendors who supply goods and services related to the Debtors' advertising program." (Critical Vendor Motion, at 8). Kmart asserted that the proposed payments were "vital" to the success of its reorganization efforts and offered in support the affidavit of Charles C. Conaway, Kmart's then chief executive officer.

Capital Factors, Inc., one of Kmart's creditors, opposed the request and cross-examined

---

[1]    The parties contend that the court may take judicial notice of all matters in the record of Kmart's underlying bankruptcy case without converting these motions under Fed.R.Civ.P. 12(b)(6) to motions for summary judgment. (*See, e.g.,* Chicago Sun-Times Brief, at 3 (citing, *inter alia, Henson v. CSC Credit Services,* 29 F.3d 280, 284 (7ᵗʰ Cir. 1994)). In accordance with the parties' requests, the facts set forth herein include matters which are of record in this bankruptcy case. Also included are other matters of public record susceptible to judicial notice.

Conaway at the hearing on the Critical Vendor Motion (the "Critical Vendor Hearing"). At the conclusion of the hearing, the court allowed the motion, and an order was entered (the "Critical Vendor Order") providing that the Debtors were "authorized, but not directed, in the reasonable exercise of their business judgment, to pay all, a portion or none of the prepetition claims" of vendors in the four categories described above. The Critical Vendor Order further required Debtors to undertake "appropriate efforts" to cause the vendors to enter into "Trade Agreements" calling for the same trade terms that the vendors had historically provided to Kmart ("Customary Trade Terms") or other favorable terms agreed to by the parties.[2]

Capital Factors appealed the Critical Vendor Order, as well as three other orders authorizing payment of certain categories of prepetition claims,[3] to the district court. As no order staying the payments was entered, Kmart proceeded to make the payments (the "Critical Vendor Payments") of the prepetition claims of those vendors (the "Critical Vendors") it deemed critical to its reorganization efforts.[4]

While the appeals were pending, Kmart also proceeded with the negotiation and formulation of its reorganization plan. Kmart filed its plan and disclosure statement on January 24, 2003.

---

[2]    The Trade Agreements were also to provide, *inter alia*, that the vendors would refrain from asserting reclamation claims or liens for prepetition debts.

[3]    The three additional orders were the "Order Under 11 U.S.C. § 105(a) Authorizing the Payment of Prepetition Claims of Certain Liquor Vendors," the "Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing Payment of Prepetition Obligations Necessary to Obtain Imported Merchandise," and the "Order Pursuant to 11 U.S.C. §§ 105(a) and 363 Authorizing the Debtors to Honor Reimbursement Obligations to Issuers of Pre-Petition Letters of Credit Issued for the Benefit of the Debtors' Foreign Vendors." The term "Critical Vendor Order" will hereafter refer, as necessary, to all four of the orders appealed.

[4]    The term "Critical Vendor Payments," as used herein, also includes those payments made pursuant to the three additional orders that Capital Factors appealed, and the term "Critical Vendors" includes the recipients of payments under all four orders. The term "Critical Vendor Claims," as used herein, refers to the prepetition claims of the Critical Vendors, to the extent paid pursuant to the Critical Vendor Order.

Thereafter, a First Amended Joint Plan of Reorganization was filed (the "First Amended Plan") together with an accompanying disclosure statement (the "Disclosure Statement"). On February 26, 2003, an order was entered approving the Disclosure Statement and setting the hearing on confirmation of the First Amended Plan for April 14, 2003. Kmart thereafter served notice of the confirmation hearing on creditors and parties in interest, together with - - where required - - copies of the Disclosure Statement, the First Amended Plan, and, if applicable, appropriate ballots.

The Disclosure Statement advised that Kmart planned to waive its "Avoidance Claims" with certain exceptions, one of which was for Avoidance Claims pending on the effective date of the plan. "Avoidance Claims" was defined to include, *inter alia*, preference actions under §547, fraudulent transfer actions under §548, and actions to recover postpetition transfers under §549 of the Bankruptcy Code. A lengthy description of the analysis of potential preference recoveries, prepared by Debtors in connection with the waiver of Avoidance Claims and the justification therefor, was set forth at pages 101 through 104 of the Disclosure Statement.

The Critical Vendor program was discussed in a different part of the Disclosure Statement. On page 23, Kmart warned that if the Critical Vendor Order was reversed on appeal, the estates may hold claims against certain recipients of the Critical Vendor Payments for recovery of the amounts received. That risk materialized on April 8, 2003, when the district judge signed a memorandum opinion and order finding, *inter alia*, that the bankruptcy court did not have "either the statutory or equitable power to authorize the pre-plan payment of prepetition unsecured claims ... ." *Capital Factors, Inc. v. Kmart Corp.*, 291 B.R. 818, 823 (N.D.Ill. 2003).

The district court's reversal of the Critical Vendor Order was entered on the docket on April 10, 2003, just two business days before the commencement of the confirmation hearing. Kmart, in

addition to filing a notice of appeal to the Seventh Circuit, immediately prepared an amendment to

its plan to provide for the retention of recovery actions against the Critical Vendors.  Specifically,

Kmart carved out an additional exception to the waiver of Avoidance Claims in Section 7.14 of the

plan for "Avoidance Actions under Section 549 of the Bankruptcy Code with respect to the matters

subject to that certain case captioned Capital Factors, Inc. v. Kmart Corporation, Case No. 02 C 1264

(N.D. Ill. 2002) ..." (the "Plan Modification").[5]  The language of the Plan Modification was set forth

in ¶55 of Kmart's proposed findings of fact and conclusions of law regarding confirmation, which

were attached to and referenced in its memorandum of law in support thereof (the "Confirmation

Brief").  Kmart served the Confirmation Brief on April 10, 2003 via UPS Next Day Air on all parties

listed on the Master Service List in this case and mailed it to the parties listed on the 2002 List.[6]

On the same day, Capital Factors filed an emergency motion to stay the confirmation hearing

---

[5]     The revised retention provision reads in full as follows:

**7.14  Preservation of Causes of Action.**  In accordance with section 1123(b)(3) of the Bankruptcy
Code and except as otherwise provided in this Plan with respect to the Kmart Creditor Trust, the
Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions, except
that the Debtors shall and do hereby waive all Avoidance Claims as of the Effective Date (other than
Avoidance Actions under Section 549 of the Bankruptcy Code with respect to the matters subject to
that certain case captioned Capital Factors, Inc. v. Kmart Corporation, Case No. 02 C 1264 (N.D. Ill.
2002); provided, however, that such waiver does not include Avoidance Claims against Persons who
are parties to Causes of Action involving the Debtors and are pending on the Effective Date, nor does
it include Causes of Action against any Persons who may be the subject, at any time, of Trust Claims.
The Debtors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether
to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the
foregoing), and will not be required to seek further approval of the Bankruptcy Court for such action.
The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the
best interests of the Reorganized Debtors or any successors holding such rights of action.

[6]     The 2002 List included all parties who had filed a notice of appearance or request for notice in this
case.  The Master Service List included, inter alia, the United States Trustee, committee counsel, counsel to the pre-
and post-petition lenders, and all parties who had been placed on that list pursuant to the written request procedures
established in this court's "Order Pursuant to 11 U.S.C. §§ 102 and 105(a), Bankruptcy Rules 2002(m) and 9007,
and Local Rules 101, 400, and 402 Establishing Omnibus Hearing Dates and Certain Notice, Case Management and
Administrative Procedures" (as amended from time to time, the "Procedures Order").  Under the Procedures Order,
notice to parties who had requested and obtained placement on the Master Service List was more comprehensive
than notice to 2002 List parties.

and for the entry of orders directing return of the Critical Vendor Payments. Capital contended, *inter alia*, that because the district judge had "remanded" for further proceedings consistent with his opinion, this court was required to "immediately enter appropriate orders to compel the return of the monies paid ... ." (Emergency Motion of Capital Factors, at 2-3). Capital also argued that the confirmation hearing should be continued to allow for the entry and enforcement of such orders and for a resolicitation of votes.[7]

Another emergency motion was filed by Dean Foods Company, one of the Critical Vendors, seeking leave to file an objection to the Plan Modification and to adjourn the hearing on confirmation of the plan. According to Dean, the "drastic modification" to Section 7.14 of the Plan constituted a material change in the plan's treatment of the Critical Vendors' claims, i.e., from what was "in effect" administrative expense treatment pursuant to the Critical Vendor Order to treatment as general unsecured claims. Dean therefore contended that the modified plan should not be deemed accepted by creditors who had previously accepted the plan until after notice and hearing as to whether the Plan Modification adversely changed the treatment of their claims within the purview of Bankruptcy Rule 3019. (Emergency Motion of Dean Foods, at 2, 4).

Kmart filed an omnibus response to the emergency motions and objections of Capital Factors and Dean Foods, and the court heard arguments at the confirmation hearing not only by Capital, Dean, and Kmart, but also by Handleman Company, another Critical Vendor, who also urged that the Critical Vendors needed additional time to review the proposed modification to the plan. After

---

[7] According to Capital Factors, continuance of the confirmation hearing would allow parties in interest "to assess the impact of the returned funds upon the Plan's proposed treatment of unsecured claims and to vote on an amended plan." (Emergency Motion of Capital Factors, at 3). In its Supplemental Objection to Confirmation, Capital stated, *inter alia*, that "the holders of critical vendor repayment claims must be given an opportunity to vote on any amended plan." (Supplemental Objection, at 2).

argument, the court ruled that the notice of hearing already given was adequate for purposes of Bankruptcy Rule 3019 and that the Critical Vendors need not be "designated" under that rule for purposes of any additional notice.  The court further ruled that the Plan Modification did not adversely change the treatment of the claims of creditors under the plan.  Finally, the court rejected Capital Factors' contention that the district court's "remand" for consistent proceedings required the immediate entry of orders directing return of the moneys paid or a stay of the confirmation hearing. The court found that the district judge's reversal merely required that Kmart preserve in its plan the right to recover the Critical Vendor Payments by initiation of separate adversary proceedings with concomitant due process safeguards.  (April 14, 2003 Transcript, at 220-25).

The confirmation hearing proceeded over the next few days, and on April 22, 2003, Kmart ultimately reached a settlement with Capital Factors which, after disclosure and argument at the confirmation hearing, was approved by the court.  The settlement, which resolved Capital's objections to confirmation, provided, *inter alia*, for expedited resolution of the various claims asserted by Capital, for dismissal by Capital of its appeal of an order relating to the Debtors' surety program, and for Capital's participation in 15% of recoveries from Critical Vendors under §§549 and 550 of the Bankruptcy Code, with such participation to be at least $500,000 and not to exceed $2 million.  (April 22, 2003 Transcript, at 220-25).

Confirmation of the plan as modified (hereafter, the "Plan") was ultimately approved on April 22, 2003, and the court's "Findings of Facts, Conclusions of Law, and Order under §§ 1129(a) and (b) and Fed.R.Bankr.P. 3020 Confirming the First Amended Joint Plan of Reorganization of Kmart Corporation and its Affiliated Debtors and Debtors in Possession, as Modified" (the "Confirmation Order") was entered on the docket on April 23, 2003.  The Plan became effective on

May 6, 2003.

Under the Plan, certain classes of claims, including Class 5, were to be receive distributions of common stock.  Class 5 consisted of all "Trade Vendor/Lease Rejection Claims," defined to include claims "arising as a result of ... retail merchandise or services provided by trade vendors or service providers ... ."  Plan, §1.153.  A total of 31,945,161 shares of common stock in the reorganized company were allocated to this class, which Kmart estimated in its Disclosure Statement to be approximately 37% of all such stock to be issued under the plan.[8]

The Plan further provided that a reserve was to be created for potential distributions on disputed or contingent claims, after allowance (the "Distribution Reserve").  Plan, §9.8(b).  The Distribution Reserve was to include a portion of the common stock allocated to creditors under the Plan, and the amount of the reserve was to be adjusted from time to time.  Kmart has filed a number of "Notices of Intent to Modify Distribution Reserve," indicating in each instance the percentage of shares in the Distribution Reserve being released and the resulting increase in the percentage of allocated shares that are available for distribution.[9]

Not long after the Plan was confirmed, Kmart filed its first actions for recovery of Critical Vendor Payments.  In May, 2003, Kmart filed an action against Meridian Retail, Inc., and in June, it filed an action against Handleman Company.  The bulk of the actions, however, were filed in

---

[8]       Class 5 would also share pro rata with certain other classes in Trust Recoveries, i.e., proceeds received by the Kmart Creditor Trust from the prosecution or settlement of "Trust Claims."  Trust Claims consisted of actions relating to the subject matter of certain investigations into alleged accounting irregularities and malfeasance by members of Kmart's management.

[9]       For example, the notice filed on December 4, 2003 announced that 40% of the shares remaining in the Distribution Reserve would be released, resulting in 70% of the allocated shares being available for distribution. The most recent of these notices, filed on January 13, 2006, announced a release of 10% of the remaining shares, resulting in 95% of the allocated shares being available.

January of 2004. At that time, the Seventh Circuit had not yet ruled on the appeal of the Critical Vendor Order, and the statute of limitations for the §549 actions was about to expire.[10] Accordingly, on or about January 26, 2004, Kmart filed actions against hundreds of recipients of Critical Vendor Payments. The complaints were for the most part substantially identical, each containing a count seeking avoidance and recovery under §§549 and 550 of the Bankruptcy Code and a second count seeking recovery under §105.

The Seventh Circuit ultimately affirmed the district court's reversal of the Critical Vendor Order on February 24, 2004. The Court held, *inter alia*, that §105 does not provide authority to make full payment of only certain of the prepetition claims in a class. *In re Kmart Corp.*, 359 F.3d 866, 871 (7th Cir. 2004), *reh'g and reh'g en banc denied* (May 6, 2004); *cert. denied*, 543 U.S. 986, 995 (2004). The Court further found that the order could not be sustained under §503, which deals with administrative expenses, or under §364(b), which authorizes the debtor to obtain credit "but has nothing to say about how the money will be disbursed or about priorities among creditors." *Id.* at 872. While the Court indicated that §363(b)(1) was "more promising" as a source of authority for payment of prepetition debts - - at least where the record establishes certain foundational requirements, including the prospect of benefit to the disfavored creditors - - the Court held that it need not decide that issue, as the record made at the Critical Vendor Hearing in this case was inadequate in any event. *Id.* at 872-74.

After the Seventh Circuit's decision, in May of 2004, this court entered its "Order Granting Motion for Approval of Case Management Procedures and for Extension of Time to Effect Service

---

[10]    An action to avoid a transfer under §549 "may not be commenced after the earlier of – (1) two years after the date of the transfer sought to be avoided; or (2) the time the case is closed or dismissed." 11 U.S.C. §549(d).

of Summons and Complaints"(the "Case Management Order") to govern the hundreds of actions against Critical Vendors that Kmart had filed in this case (the "Critical Vendor Actions"). That order fixed June 10, 2004 as the deadline for filing motions to dismiss, and it further required Kmart, upon the expiration of that period, to prepare and file a report listing separately those motions raising matters having general applicability to all or many defendants (as labeled in the Case Management Order, the "General Defense Motions") and those motions raising individual issues (the "Special Defense Motions"). Defendants were allowed to join in any General Defense Motion, in lieu of preparing their own, by filing a notice of joinder by June 24, 2004. Pursuant to the Case Management Order, briefing of the General Defense Motions was completed by October, 2004, and a status hearing was held on November 16, 2004. Oral arguments on the General Defense Motions were heard on January 31, 2005.

Thereafter, on March 22, 2005, one of the defendants, Vertis, Inc., presented a motion to "clarify" the Confirmation Order and Plan. Vertis alleged in the motion that Kmart and Sears Roebuck & Co. had entered into an agreement for a merger anticipated to take place on or about March 24, 2005, calling for the formation of a newly organized Delaware corporation to be named Sears Holding Corporation. Vertis further alleged that as a result of the merger, the common stock designated in the Plan for distribution to Class 5 creditors, i.e., Kmart common stock,[11] would cease to exist. Although each share of Kmart stock outstanding as of the effective time of the merger

---

[11]   More specifically, under the Plan, the shares allocated for distribution to Class 5 are shares of "New Holding Company Common Stock." Plan, §1.152. "New Holding Company Common Stock" is defined in §1.97 as "... the shares of common stock of New Holding Company authorized under Article 7.8 of this Plan and under the articles of incorporation of New Holding Company." In §1.96, "New Holding Company" is defined as "a corporation to be created pursuant to the terms of this Plan, or, in the discretion of Kmart's board of directors after consultation with the Creditors' Committees, a Reorganized Debtor, to hold 100% of the New Operating Company Common Stock on and after the Effective Date." Vertis alleges that Kmart Holding Corporation is the entity defined in the Plan as "New Holding Company." Vertis Amendment, at 5, n. 4.

would be converted into the right to receive one share of Sears Holding Corporation common stock,

those Kmart shares that were still owned by Kmart at the time of the merger would, according to

Vertis, be canceled, without any right of conversion. It was therefore Vertis' position that Kmart's

action for return of its Critical Vendor Payment would have to be dismissed, as Kmart would no

longer be able to satisfy - - in Kmart common shares rather than shares of Sears Holding

Corporation - - the claim to which Vertis would become entitled under §502(h) of the Bankruptcy

Code upon return of the Critical Vendor Payment.[12]  The motion sought a "clarification of the

consideration that will be available to Class 5 Trade Vendor/Lease Rejection Claimholders, under

the terms of the Confirmed Plan, following the effective date of the proposed ... Merger ... ."

(Motion to Clarify, at 8).

Vertis also requested entry of an order requiring Kmart to dismiss the action against it as

moot on the first business day following the close of Kmart common stock at or above $134.61 per

share. Vertis explained that the Class 5 stock distribution to which it would become entitled under

§502(h) upon return of the full amount of its Critical Vendor Payment was 53,490 shares.[13]

According to Vertis, the stock was trading, at the time the motion was written, at approximately

$132.50 per share. If the stock reached $134.61, the value of Vertis' stock distribution on the

§502(h) claim would exceed the amount of the Critical Vendor Payment sought to be recovered by

---

[12]   Section 502(h) gives a transferee of property that is recovered under §550 a prepetition claim for the amount recovered. Specifically, it provides that a "claim arising from the recovery of property under section ... 550 ...shall be determined, and shall be allowed ... or disallowed ... the same as if such claim had arisen before the date of the filing of the petition."  11 U.S.C. §502(h).

[13]   Under the Plan, a Class 5 claimant's pro rata share of the stock to be distributed to that class was calculated by multiplying the total number of shares to be distributed, i.e., 31,945,161 shares, by a fraction, the numerator of which is the amount of the claimant's Class 5 claim and the denominator of which is the total of Class 5 claims. Plan, at §5.5. Since the Critical Vendor Action against Vertis sought approximately $7.2 million, and the total claims in Class 5 were estimated in the Disclosure Statement to be $4.3 billion, Vertis calculated its pro rata distribution as 53,490 shares, i.e., 31,945,161 shares X ($7,200,000/$4,300,000,000).

Kmart.[14] Vertis contended that the action would then be moot.[15] Alternatively, Vertis requested that

Kmart be required to distribute to Vertis, within one business day of Vertis' payment on any

judgment or upon voluntary payment of the full amount of the Critical Vendor Payment, the stock

to which it would be entitled under §502(h).

Vertis' motion to clarify was denied without prejudice, and on April 5, 2005, Vertis filed an

amendment and supplement to its motion to dismiss (the "Vertis Amendment"). The Vertis

Amendment raises only the first of the contentions made in the motion to clarify, i.e., that the action

must be dismissed because Kmart common stock - - the designated currency for distributions to

Class 5 under the Plan - - no longer exists.

Kmart filed its response to the Vertis Amendment on May 4, 2005, and Vertis filed its reply

on May 13, 2005. The matter was thereafter taken under advisement. Although Vertis ultimately

reached a settlement with Kmart, several of the defendants that joined in the Vertis Amendment have

not. Accordingly, the argument pressed in the Vertis Amendment is one of the grounds for dismissal

raised herein.

The other grounds are those asserted in the General Defense Motions (and joinders) filed in

Critical Vendor Actions that remain pending.[16] The Movants primarily contend: 1) that the Critical

Vendor Payments may not be avoided under §549 because the payments were authorized at the time

they were made; 2) that §105 does not provide an independent cause of action for recovery of the

---

[14]    At $134.61 per share, 53,490 shares would have a value of $7,200,288.90.

[15]    Vertis believed that the action would then have no benefit to Kmart, because Vertis would be
receiving more than what it paid to Kmart pursuant to any judgment. Vertis, however, overlooked the fact that
Kmart would not be distributing cash in exchange for Vertis' payment; it would merely be distributing its own stock.

[16]    Since the entry of the Case Management Order, hundreds of the Critical Vendor Actions have
settled, including many of those in which General Defense Motions or joinders were filed.

payments; 3) that Kmart's current attempt to secure avoidance and recovery is barred by the doctrine

of judicial estoppel; 4) that the defendants are not bound by the Plan Modification; and 5) that Kmart

failed to retain the §549 actions in its Plan.


## DISCUSSION

### Avoidance of the Critical Vendor Payments under §549 of the Bankruptcy Code.

Movants[17] contend that Kmart cannot recover under §549 because the transfers of the Critical

Vendor Payments were authorized by this court.  Section 549 provides in relevant part:

> [T]he trustee may avoid a transfer of property of the estate –
>    (1)  that occurs after the commencement of the case; and
>    (2)  (A)  that is authorized only under section 303(f) or 542(c) of this title; or
>        (B)  that is not authorized under this title or by the court.

According to Movants, the Critical Vendor Order insulates their payments from avoidance

notwithstanding the subsequent reversal of that order by the district court and the Seventh Circuit.

Movants rely on the "plain meaning" doctrine, urging that recovery is prohibited because the

transfers were "authorized" at the time they were made.

Movants' singular focus on the word "authorized" is both inappropriate and unavailing. The

plainness of statutory language is determined not only by reference to the language itself, but also

by reference to the specific context in which it is used and the broader context of the statute as a

whole. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

Movants' interpretation of §549(a)(2)(B) does not comport with other provisions of the Bankruptcy

---

[17]    The term "Movants" refers in this opinion to one or more of the defendants who have filed General
Defense Motions (or joinders) in adversary proceedings that remain pending.

Code and does violence to the statutory scheme.

The court first notes, however, that even Movants' ostensibly "literal" reading of §549(a)(2)(B) fails to account for all the language used in that provision.[18] Under the statute as written, recovery from a Movant is only precluded if the transfer "*is* ... authorized under this title or by the court" (emphasis added). Movants do not even attempt to address this use of present tense; indeed, they urge repeatedly in their briefs that the transfers in this case "*were*" authorized by the court. (*See, e.g.*, Chicago Sun-Times Brief, at 11, 12, and 16).

Read naturally, in accordance with its ordinary and customary meaning, the language "a transfer ... that is ... authorized under [the Bankruptcy Code]" refers to an existing statutory authorization (as does the parallel language in subparagraph (B), concerning authorization under §303(f) or 542(c)), and not merely to a transfer that was authorized under the Code at the time it was made. The same verb, supporting the additional phrase "or by the court," most naturally carries the same perspective.[19] Again, although Movants urge a "strict language" approach, they fail to address

---

[18]    As Movants correctly assert, "'[i]t is a fundamental rule of statutory interpretation that all words in a statute must be given equal meaning and must be interpreted in light of the others.'" (*See, e.g.*, Chicago Sun-Times Brief, at 11-12, quoting from *United States v. Michalek*, 54 F.3d 325, 335 (7th Cir. 1995)).

[19]    Movants' attempt to sever the word "authorized" from the word "is" is particularly inappropriate here, because the word "authorized" is used in this provision as an integral part of the verb phrase "is ... authorized" (and not as a stand-alone adjective). When a past participle (such as "authorized") is used alone, it functions as an adjective; however, when it is used with an auxiliary verb (such as "is") to form a verb phrase, it is considered part of the verb. *See, e.g.*, John E. Warriner, *English Grammar and Composition* 42 (1982); *see also The American Heritage Book of English Usage* 25 (1996). An intervening adverb (here, the word "not") does not change this construction. *See id.* at 46. In the passive voice (such as that used in subsection (2) of §549(a)), "the main verb is always a past participle and ... the tense is expressed by an appropriate form of [the auxiliary verb] *be*." Warriner, *supra*, at 154 (emphasis in original). Here, the tense expressed by the auxiliary verb is the present tense.

The Supreme Court has noted that while it "does not review congressional enactments as a panel of grammarians," neither does it "regard ordinary principles of English prose as irrelevant to a construction of those enactments." *Flora v. U.S.*, 362 U.S. 145, 150, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960). Congress' use of verb tense is considered significant in construing statutes. *See, e.g., United States v. Wilson*, 503 U.S. 329, 333, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992).

The court further notes that pursuant to §1 of the Dictionary Act, 1 U.S.C. §1 *et seq.*, "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise ... words used in the present tense include the

or offer any explanation for the language actually used by Congress.

Far more importantly, however, Movants' purportedly literal interpretation is at odds with the rest of the statute. Their construction of §549(a)(2)(B) would have the effect of insulating all court-authorized postpetition transfers against reversal on appeal (i.e., whenever a stay was not obtained preventing the transfer), even though no specific provision authorizes that extraordinary protection. Where Congress intends such a result, it knows how to craft and include appropriate language. Such language is in fact included in both §§363 and 364 of the Bankruptcy Code. For example, §364(e) provides:

> The reversal or modification on appeal of an authorization under this
> section to obtain credit or incur debt, or of a grant under this section of a priority
> or a lien, does not affect the validity of any debt so incurred, or any priority or
> lien so granted, to an entity that extended such credit in good faith, whether or
> not such entity knew of the pendency of the appeal, unless such authorization
> and the incurring of such debt, or the granting of such priority or lien, were
> stayed pending appeal.

11 U.S.C. §364(e).[20] As the Seventh Circuit noted in *Kmart*, 359 F.3d at 869, nothing comparable to this provision is included in the Code with respect to postpetition payments on prepetition claims.

Movants resort to legislative history, arguing, *inter alia*, that the purpose of §549 is to protect those dealing with the debtor in good faith. (*See, e.g.*, Washington Post Brief, at 7, citing Report of

---

future as well as the present ..."; they do not include the past. Nothing in the context of the statute here indicates otherwise; the language of §549(a)(2)(B) describes in present tense a category of postpetition transfers that may be avoided, i.e., those that "[are] not authorized." The transfers to the Critical Vendors, made pursuant to an order now reversed, are in that category.

[20]    Similarly, §363(m) provides as follows:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this
> section of a sale or lease of property does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such authorization and such sale or lease
> were stayed pending appeal.

the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 93-137, Part I at 191-92 (1973)). The plain meaning as espoused above is wholly consistent with this legislative purpose; the provision provides protection to all transferees under court orders, whether erroneously entered or not, that are not subsequently reversed. Indeed, the very cases cited by Movants demonstrate that §549(a)(2)(B) operates to prevent collateral attack where the order authorizing the transfer, though erroneously entered, remains in full force and effect.

Movants cite, for example, *In re Knudson*, 929 F.2d 1280 (8th Cir. 1991), *rehearing denied*, 943 F.2d 877 (8th Cir. 1991), where the trustee attempted to avoid a security interest in inventory that had been granted, prior to conversion of the case to Chapter 7, in a stipulation approved by order of the bankruptcy court. The Eighth Circuit held that the security interest could not be avoided, because it was protected under §549(a)(2)(B). 943 F.2d at 878. Unlike the Critical Vendor Order in this case, however, the order in *Knudson* had never been reversed or otherwise vacated. *See* 929 F.2d at 1287. The trustee argued instead that the order was void for lack of due process. *Id.* at 1286. The Eighth Circuit rejected the voidness contention, finding that the notice requirements relied upon by the trustee were inapplicable. The Court went on to observe that even if the order had been entered erroneously (e.g., if the consideration for the security interest was inadequate under state law), the transfer would nonetheless be protected under §549(a)(2)(B). 943 F.2d 878. Nothing in the facts of the case or in the Court's opinion, however, suggests that a transfer is protected where court authorization has been reversed.

The same is true of *Vogel v. Russell Transfer, Inc.*, 852 F.2d 797 (4th Cir. 1988), also cited by Movants. There again, the trustee sought to avoid security interests granted postpetition with court approval. The Fourth Circuit found the transfers protected under §549(a)(2)(B), *id.* at 800, and

-16-

nothing in the facts of the case suggests that the order authorizing the transfers was ever reversed.

Predictably, Movants have been unable to locate a single case where recovery was denied under §549(a)(2)(B) because of a reversed authorization. Indeed, counsel for the Movants[21] conceded at oral argument that "the closest case" he could find was *In re Crivello*, 134 F.3d 831 (7th Cir. 1998), a decision involving the interpretation of §§327(a) and 328(c) of the Bankruptcy Code. In *Crivello*, a law firm employed pursuant to §327(a) as counsel for the debtor in possession had failed to disclose, prior to entry of the employment order, numerous prior connections with the debtor and insiders. The order was never appealed, but when the connections were finally disclosed in connection with a subsequent hearing on the firm's fee applications and the objections of the United States Trustee thereto, the bankruptcy court revoked the employment order and denied all fees requested. On appeal, the law firm argued that despite the dual prerequisites to employment set forth in §327(a), i.e., that a professional person be disinterested and hold no interest adverse to the estate, §328(c) grants the bankruptcy court discretion to allow fees even where these dual requirements have not been met. The United States Trustee, however, contended that since the grant of discretion in §328(c) applies only as to persons "employed under section 327," it has no application where fees are sought by a professional whose employment was erroneous, i.e., as a result of undisclosed connections and conflicts of interest.

The Seventh Circuit framed "the *critical* question" as "whether a bankruptcy court *must* deny fees when it subsequently learns that a professional never should have been employed under §327(a) in the first place or whether it has *discretion* to deny fees." *Id.* at 836 (emphasis in original). The Court found that the plain language of §328(c) provided the answer, as it vests the bankruptcy court

---

[21]    Counsel for Knight-Ridder Corporation and certain other newspaper companies stated at oral argument that he was speaking, as to the §549 argument, on behalf of the other Movants as well. (January 31, 2005 transcript, at 25).

with discretion to award or deny fees if "at *any* time during ... employment" a professional person

does not meet the dual requirements of §327(a), - - i.e., including at the *onset* of the engagement

(ergo, an erroneous employment). *Id.* at 837.

The Movants here rely principally on the Seventh Circuit's distinction in *Crivello* between

orders that are void and those that are merely erroneous or invalid, and the Court's holding that the

phrase "employed under section 327" does not require a valid employment order. *Id.* at 838-39.

Again, however, the ruling was based on the plain language of §328(c), effectively granting

discretion even where the employment order is invalid, as well as a desire to synthesize and

harmonize §§327(a) and 328(c). The Court explained:

> Unlike the [United States] Trustee's interpretation [requiring a valid
> employment order as a prerequisite to the discretion granted in §328(c)],
> our reading of the Bankruptcy Code ensures symmetry between §§ 327(a)
> and 328(c) ... The [United States] Trustee would like to use § 328(c)
> to question collaterally whether a professional should be employed. Section
> 328(c) does not govern whether a court should employ an interested person;
> § 327(a) provides the Code's response.

*Id.* at 839. Accordingly, in order to "give[] full effect to both §327 and §328," the Court held that

even the entry of an invalid employment order under §327(a) "trigger[s] the bankruptcy court's

discretion under § 328(c)." *Id.* at 838.

For obvious reasons, *Crivello* has little or nothing to say about Movants' contentions in this

case. The Court was attempting to harmonize two companion provisions, one of which granted in

"plain language" a power of discretion to the bankruptcy court that clearly applied to invalid

employment situations. *Id.* at 837. The Court noted that if the United States Trustee questioned that

"allocation of power," his argument was more appropriately addressed to Congress. *Id.* at 838. The

Court further noted that the allocation of discretionary power to the bankruptcy court was in

-18-

recognition that bankruptcy courts are courts of equity. *Id.* Since even an interested professional may provide services that are beneficial to the estate, it is appropriate for the bankruptcy court to first weigh the equities before denying fees for postpetition services that counsel is obligated by an order to provide. *Id.*

Here, of course, there is no companion provision to consider or harmonize, and the language used in §549(a)(2)(B) is different from that used in §328(c).[22] There are also no allegations of unpaid postpetition goods or services (which could be raised in any event as an affirmative defense in this action). Most importantly, however, there is no clause effectively dictating the application of §549(a)(2)(B) to an invalid, revoked order.[23] Although the *Crivello* court noted the distinction between orders that are void and those that are merely invalid, its observations cannot be divorced from the context in which they were made; the employment order under §327(a) could be considered effective without excusing the breach of that provision's dual qualification requirements, because any retrospective penalty necessary to carry out the objectives of the statute could still be enforced under §328(c).[24]

Movants cite other cases, even less apropos, that distinguish between void and voidable

---

[22]    Unlike §549(a)(2)(B), where the past participle "authorized" is used as part of the verb phrase "*is* authorized," §328(c) uses the past participle "employed" as an adjective, i.e., "a professional person employed under section 327."

[23]    Again, as discussed above, §549(a)(2)(B) *will* operate to protect transfers under orders that, while erroneous, have never been reversed or otherwise vacated.

[24]    The Court stated:

> "Our interpretation allows § 327(a) to act prospectively as a prerequisite for employment by signaling those professionals who fail to satisfy its dual requirements that they will be disqualified. *Once professionals have cleared that threshold, § 328(c) remains as a retroactive penalty for those professionals whose retention under § 327(a) was improper* or who fail to satisfy § 327(a) requirements while working for the estate. ..."

134 F.3d at 839 (emphasis added).

orders,[25] and they urge that the Seventh Circuit itself stated in *Kmart* that the Critical Vendor Order

was not "void." (*See* Jan. 31, 2005 transcript, at 29 (citing *Kmart*, 359 F.3d at 870)).  According to

Movants, that statement in the *Kmart* opinion is "dispositive" in this proceeding.

Remarkably, Movants fail to recite - - much less find "dispositive" - - any of the other

statements and pronouncements made in the *Kmart* opinion, particularly those made in rejecting the

---

[25]       *See, e.g., Trook v. Lafayette Bank and Trust Co.*, 581 N.E.2d 941 (Ind. Ct. App. 1991), where an order
appointing a bank as guardian had been entered without notice to the incompetent, Mrs. Trook, and upon her
subsequent petition, the order was vacated.  The bank then filed its final guardianship account, showing that it had
authorized the expenditure of $28,855.31 of Trook's funds.  Trook objected to the accounting and sought to charge
the bank personally with these expenditures, which the bank had made for Trook's benefit and on her behalf.  The
appellate court found that since the notice defect was waivable, the order appointing the bank as guardian was
voidable, and not void *ab initio*.  The "significance of this classification [was] that some form of guardianship
existed" before the order of appointment was vacated, - i.e., a *de facto* guardianship. *Id.* at 946.
        Significantly, the order in *Trook* did not create a *de jure* guardianship during the period the order was in
effect.  The order merely gave the bank a defense to personal liability for all expenditures that, being reasonable,
would have been approved in any event had the appointment been valid.  The court explained that a de facto
guardian who "'acts in good faith and discharges the duties which would have rested upon him if he had been a legal
guardian ... is entitled to charge proper expenditures against the funds in his hands.'" *Id.* at 948 (quoting from *Kelly
v. Kelly*, 297 P. 470, 473 (Mont. 1931)).  The court further noted: "In so concluding, we acknowledge that the
guardian is not blameless in failing to discover the defect in its appointment. ... Nevertheless, we 'will not lend [our]
aid to hold them personally liable for doing the very things that the court declares to have been done in the best
interest of the [ward], and for [whom] they were presuming to act.'" *Trook*, 581 N.E.2d at 948 (quoting from *Jessup
v. Jessup*, 46 N.E. 550, 553 (Ind. Ct. App. 1897)).  Again, the "voidable" order of appointment in *Trook* did not
create a *de jure* guardianship but merely provided the bank with a defense against Trook's effort to hold it personally
liable for the disbursements made on her behalf.
        Similarly, in *Laird v. Vogel*, 334 So.2d 650 (Fla. Dist. Ct. App. 1976) (from which the *Trook* quote relied
on by Movants is taken), summary judgment was awarded in an unlawful detainer action, together with an order for
possession, in favor of a tax sale purchaser.  The judgment and order were later rescinded, but not until after the
purchaser had taken possession of the property, and the owner's belongings had been removed, resulting in damage.
In a suit brought by the owner against the tax sale purchaser and her attorney (who was also the owner's former
counsel), the appellate court held that the defendants' actions did not give rise to personal liability for the damages
claimed, because they had proceeded under an order of the court and a presumptively valid tax deed. *Id.* at 651.
Thus, in both *Trook* and *Laird*, parties who had taken action in reliance on an invalid order were protected against
personal liability for damages resulting from such actions; they were able to assert the order as an affirmative
defense, in whole or in part, to liability.
        Here, of course, it was Debtor Kmart who, in reliance on the Critical Vendor Orders, paid out the funds at
issue to Movants.  Movants nonetheless claim that they took action in 'reliance' on the Critical Vendor Orders, *e.g.*,
by providing customary trade terms postpetition.  While Movants may not be precluded from asserting any damages
based thereon as an affirmative defense in this proceeding, the cited authorities clearly do not support Movants'
position that they are entitled to retain all the funds which Kmart, in reliance on the Critical Vendors Order, paid out
to them from the assets of this estate.  Indeed, Movants do not discuss any of the facts of the cited cases but merely
rely on general statements, out of context, concerning the effect of "voidable" judgments or orders. *See also Chapin
v. Hulse*, 599 N.E.2d 217 (Ind. Ct. App. 1992) (another factually inapposite case cited by Movants for the same
purpose).  Interestingly, in *Chapin*, the appellate court noted that invalid judgments are normally classified as merely
'voidable' to promote the goal of finality of judgments "*where a party has assented to the error ... by failing to
perfect an appeal ....*" *Id.* at 222 (emphasis added).

-20-

appellants' contentions under the doctrine formerly known as "equitable mootness."[26] Certain of the appellants had argued that the appeal should have been dismissed by the district court because effective judicial relief was no longer available. They contended, *inter alia*, that they had detrimentally relied on the Critical Vendor Order and that confirmation of Kmart's plan of reorganization constituted a comprehensive change in circumstances warranting dismissal of the appeal. (*See, e.g.*, Brief for Appellant Knight-Ridder, Inc., filed in the appeal before the Seventh Circuit, at 13, *et seq.*) In addition, an amicus brief was filed by one of the vendors, urging "mootness" based, *inter alia*, on the very contentions made here about the "plain language" of §549(a)(2)(B).[27]

The Seventh Circuit held that it was not too late to recover the funds paid pursuant to the Critical Vendor Order. Not only did the Court reject the appellants' contentions concerning detrimental reliance, but it also noted that Kmart's plan provided for the filing of adversary

---

[26]     As noted by the district court, "[t]he Seventh Circuit in *UNR* 'banish[ed] the term "equitable mootness" from the (local) lexicon,' 20 F.3d at 769, because it is misleading: '[t]here is a big difference between *inability* to alter the outcome (real mootness) and *unwillingness* to alter the outcome ("equitable mootness")."' *Capital Factors, Inc. v. Kmart Corp.*, 291 B.R. 818, 823 (N.D.Ill. 2003) (quoting from *In re UNR Industries, Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) (emphasis in original)).

[27]     Meridian Retail, Inc. filed a motion for leave to file an amicus brief, stating that the brief (which was "conditionally" filed with the Motion) would draw the court's attention to two arguments that had escaped consideration by the appellants, i.e., that the appeal was moot under specific provisions of the Bankruptcy Code, including §549(a)(2)(B), and that the Critical Vendor Payments could be authorized as, in effect, premiums necessary to induce creditors to extend postpetition credit. (Motion of Meridian Retail, Inc. For Leave to File a Brief *Amicus Curiae*, at 2, 4-5). Capital Factors filed a response opposing the filing of the amicus brief, urging, *inter alia*, that the §549(a)(2)(B) argument was not ripe for review and that the remaining arguments were largely duplicative of the appellants' briefs. The Seventh Circuit ordered Meridian, which had already been sued by Kmart under §549, to file a supplement to its motion stating why it believed its interests were not already adequately represented by the appellants. In its supplement, Meridian argued certain factual distinctions between it and the appellants, as well as the omission by the appellants of "certain critical arguments," including "mootness under Section 549(a)(2)(B) ..." The Seventh Circuit entered an order allowing Meridian to file a portion of its brief, specifically including the §549 argument. In the brief as filed, Meridian cited *Knudson, Vogel*, and other cases relied upon by Movants here (discussed above), urging that under the plain meaning of §549(a)(2)(B), a postpetition transfer, once "authorized" by the court, cannot be unwound unless the order was stayed pending appeal. (Motion of Meridian Retail, Inc. For Leave to File a Brief *Amicus Curiae*, at 7-11).

proceedings "to recover the preferences that the critical vendors have received," i.e., the §549 actions

provided for in the Plan Modification. *Kmart*, 359 F.3d at 870.[28] The Court stated:

> Appellants insist that, by the time [the district court] acted, it was too late. Money
> had changed hands and, we are told, cannot be refunded. But why not? Reversing
> preferential transfers is an ordinary feature of bankruptcy practice, often continuing
> under a confirmed plan of reorganization. ... If the orders in question are invalid,
> then the critical vendors have received preferences that Kmart is entitled to recoup
> for the benefit of all creditors. ... Several provisions of the Code do forbid revision
> of transactions completed under judicial auspices. For example, the DIP financing
> order ... is sheltered by 11 U.S.C. § 364(e) ... . Nothing comparable anywhere in
> the Code covers payments made to pre-existing, unsecured creditors, whether or not
> the debtor calls them "critical." Judges do not invent missing language.

*Id.* at 869. The Court concluded that the vendors had failed to establish that "any language in the

Code" blocked future attempts to recover the preferential transfers on account of their pre-petition

debts. *Id.* at 870.

These statements by the *Kmart* court were not dicta, but constituted an essential part of the

Court's ruling on issues that required disposition prior to reaching the merits. Movants who were

not parties to the appeal may not be *formally* bound by these rulings, but they nonetheless "must

accept the precedential effect of [the Court's] decision." *Id.* at 871. Although this court has

concluded independently that the Critical Vendor Order, now reversed, fails to shield the transfers

from recovery under §549(a)(2)(B), the *Kmart* opinion provides additional precedent, the force of

which cannot seriously be questioned.

Movants next attempt to circumvent this problem and fit within the statutory language by

contending that the transfers were separately authorized in the DIP Financing Order, - - an order that

---

[28]    Because of their obvious effect, courts often refer to §549(a) transfers as postpetition "preferences." *See,*
*e.g., In re D.J. Management Group, Inc.*, 164 B.R. 831, 836 (Bankr. W.D.N.Y. 1994); *In re James B. Downing &*
*Co.*, 74 B.R. 906, 910 n. 5 (Bankr. N.D.Ill. 1987); *In re Skye Marketing Corp.*, 11 B.R. 891, 899 (Bankr. E.D.N.Y.
1981); *In re Blaine Richards & Co., Inc.*, 10 B.R. 424, 428 (Bankr. E.D.N.Y 1981).

was never appealed and remains in full force and effect. According to Movants, "[t]he authority

conferred by the final DIP Financing Order ... constitutes express authority to make the Critical

Vendor Payments and satisfies both the plain language and purpose of Section 549." (*See, e.g.,*

Chicago Sun-Times Brief, at 13).

Movants point to language contained in ¶6(a) of the DIP Financing Order, which provides

in relevant part as follows:

> 6.    Authorization To Incur Post-Petition Financing and Enter into the Loan
> Documents.
>        (a)    The Documents ... are hereby approved. The Borrower is authorized
> to borrow, obtain letters of credit and incur overdrafts and related liabilities pursuant
> to the DIP Credit Agreement ... up to an aggregate of $2.0 billion (exclusive of the
> amount of such overdrafts and related liabilities), in accordance with the terms of
> the DIP Credit Agreement ... , which shall be used for (i) making the First Day
> Order Payments, (ii) general corporate purposes, including providing working capital
> for the Borrower and the Guarantors and (iii) payment of any related transactions
> costs, fees and expenses, in accordance with the DIP Credit Agreement.

Relying on this provision, Movants essentially invite the court to conclude that the "dedicated and

earmarked nature of the borrowings" established "express authority" to make the Critical Vendor

Payments. (*See, e.g.,* Chicago Sun-Times Brief, at 13).

Such a conclusion, however, is not supported by the language, purpose, or intent of the order,

all of which are directed toward an authorization to borrow. Moreover, even putting aside the

Seventh Circuit's admonition that §364(b) "has nothing to say about how [funds borrowed by a

debtor in possession] will be disbursed," *Kmart*, 359 F.3d at 872, Movants' contention further

stumbles on the language of the DIP Financing Order itself. The order defines First Day Order

Payments as "the payment of such pre-petition claims *as may be permitted by the Court pursuant*

*to the 'first day' orders* that have been consented to by the Post-Petition Agent and the Initial

Banks." (DIP Financing Order, at 2; emphasis added). Contrary to Movants' contentions, the

financing order contains no separate and independent authorization for the Critical Vendor

Payments, but merely refers back to the Critical Vendor Orders themselves for the requisite court

authority. Movants thus fare no better under the DIP Financing Order in their quest to prevent

avoidance under §549.

## Recovery under §105 of the Bankruptcy Code.

Count II of the Critical Vendor Complaints, designated "For Avoidance and Recovery

Pursuant to 11 U.S.C. §105," seeks "avoidance" of the Critical Vendor Payments pursuant to §105

and judgment for the full amount of the payments plus interest and costs.[29] The count alleges that

"[s]ince the [Critical Vendor] Order has been reversed, it would be contrary to the Bankruptcy Code

and inequitable for Defendant to be permitted to retain the Payment and thereby be paid in full on

its pre-petition claim when all other unsecured creditors were not paid in full." Movants respond

by contending, *inter alia*, that there is no private right of action under §105 of the Bankruptcy Code.

(*See, e.g.*, Chicago Sun-Times Brief, at 16-18).

The private right of action issue has often been discussed in bankruptcy cases in connection

with alleged violations of the discharge injunction and the filing of inflated secured claims. *See, e.g.*,

*Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502 (9th Cir. 2002); *Pertuso v. Ford Motor Credit Co.*, 233

F.3d 417 (6th Cir. 2000); *Holloway v. Household Automotive Finance Corp.*, 227 B.R. 501 (N.D.Ill.

---

[29]　Section 105(a) of the Bankruptcy Code provides as follows:

The court may issue any order, process, or judgment that is necessary or appropriate
to carry out the provisions of this title. No provision of this title providing for the
raising of an issue by a party in interest shall be construed to preclude the court from,
sua sponte, taking any action or making any determination necessary or appropriate to
enforce or implement court orders or rules, or to prevent an abuse of process.

1998); *In re Knox*, 237 B.R. 687 (Bankr. N.D.Ill. 1999); *In re Lenior*, 231 B.R. 662 (Bankr. N.D.Ill.

1999). In *Knox*, for example, the defendant secured creditor had filed a proof of claim in Knox's

Chapter 13 case, listing the secured portion of the claim as the entire balance due, notwithstanding

that the balance included unmatured interest (in contravention of §502(b)(2)) and exceeded the value

of the collateral (in contravention of §506(a)). Knox objected to the claim, and an order was entered

requiring the bifurcation of the claim into secured and unsecured portions, with the secured claim

limited to the value of the collateral, and with no claim for unmatured interest.

Knox subsequently filed an adversary proceeding, as a purported class action on behalf of

herself and others allegedly harmed by the secured creditor's practice of filing such inflated claims.

One count was premised upon §105 and sought injunctive relief to stop the creditor's practice,

sanctions for the alleged wrongful conduct, an order compelling the creditor to amend its claims, a

refund of overpayments and expenses, and an award of attorney's fees. Upon a motion to dismiss this

count, the court first noted that an exercise of the §105 power must ordinarily be tied to another

specific section of the Bankruptcy Code. *Id.* at 699-700. The court then applied the four-part test of

*Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), to determine whether a private right

of action existed, i.e.,

> (1) whether the plaintiff is a member of a class for whose especial benefit
> the statute was enacted; (2) whether there is any explicit or implicit indica-
> tion of congressional intent to create or deny a private remedy; (3) whether
> a private remedy would be consistent with the underlying purposes of the
> legislative scheme; and (4) whether the cause of action is one traditionally
> relegated to state law.

*Knox*, 237 B.R. at 700 (citing *Allison v. Liberty Sav.*, 695 F.2d 1086, 1088 (7th Cir. 1982), in turn

citing *Cort v. Ash*, 422 U.S. at 78). The *Knox* court noted that in the application of the test, "the four

factors are not equally weighted; the central inquiry is whether Congress intended to create a private

right of action." *Knox*, 237 B.R. at 700; *see also Touche Ross & Co. v. Redington*, 442 U.S. 560, 575,

99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). The court found that no private right of action existed under

§105, noting that "very adequate and effective remedies" were already available through the Code and

Rules to redress the alleged improper claims filings, *e.g.*, through sanctions under Rule 9011. The

court added that "[m]ost courts ... address[ing] the issue have determined that no private remedy or

private right of action is created by § 105," *Knox*, 237 B.R. at 700, citing, *inter alia*, *Holloway v.*

*Household Automotive Finance Corp.*, 227 B.R. 501 (N.D.Ill. 1998); *In re Simmons*, 224 B.R. 879

(Bankr. N.D.Ill. 1998), and *In re Costa*, 172 B.R. 954 (Bankr. E.D.Cal. 1994).

After these decisions were rendered, similar issues were raised in a number of appellate court

cases. In *Bessette v. Avco Financial Services, Inc.*, 230 F.3d 439 (1st Cir. 2000), the Chapter 7 debtor

had executed a reaffirmation agreement with Avco Financial Services, a secured creditor, but the

agreement was never filed with the court as required by §524 of the Bankruptcy Code, and it also

failed to meet certain other requirements of that provision. The debtor subsequently brought an action

in the district court for the district in which her bankruptcy case had been filed, purportedly as a class

action, seeking damages against Avco for violation of the discharge injunction of §524, relying

primarily on the theory that §524 provides a private right of action.[30] She contended in the alternative

that the district court was authorized to grant relief via §105(a). *Id.* at 443.[31]

Avco disputed that a private right of action was available under §524 and urged instead that

---

[30]    The court noted elsewhere that the debtor contended the reaffirmation agreement was void and
unenforceable and that she was therefore entitled to restitution. *Bessette*, 230 F.3d at 444.

[31]    She also brought a state law claim for unjust enrichment and later amended her complaint to add
claims under the Racketeer Influenced Corrupt Organizations Act. *Bessette*, 230 F.3d at 443.

the proper remedy was contempt. The First Circuit, noting a division among the courts on the private right of action issue, saw "no reason to jump into the fray with the complex analysis required by *Cort v. Ash* when a remedy is readily and expressly available through ... § 105(a)." *Bessette*, 230 F.3d at 444. The Court held that while §105 "does not itself create a private right of action, ... a court may invoke § 105(a) 'if the equitable remedy utilized is demonstrably necessary to preserve a right elsewhere provided in the Code,' ... so long as the court acts consistent with the Code and does not alter the Code's distribution of other substantive rights." *Id.* at 444-45 (quoting from *Noonan v. Secretary of Health & Human Servs. (In re Ludlow Hosp. Soc'y, Inc.)*, 124 F.3d 22, 28 (1st Cir. 1997)). Since §105 provides a bankruptcy court "with statutory contempt powers, in addition to whatever inherent contempt powers the court may have," the Court held that §524 is enforceable through a contempt proceeding under §105. *Bessette*, 230 F.3d at 445. The Court also reversed the district court's ruling that the debtor could only bring her claims in the court that issued the original discharge order, noting that a "district court sitting in bankruptcy is similarly authorized to invoke its equitable powers under § 105 when necessary to carry out the provisions of the Bankruptcy Code." *Bessette*, 230 F.3d at 446.

A similar set of facts was presented to the Sixth Circuit in *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417 (6th Cir. 2000). Again, the Chapter 7 debtors had entered into a reaffirmation agreement with a secured creditor, Ford Motor Credit Company, and the agreement was never filed with the court. The debtors remained current on their payments to Ford both before and after the discharge was entered. Thereafter, they filed a purported class action against Ford in the district court for the Eastern District of Michigan (their bankruptcy had been filed in the Rhode Island bankruptcy court), alleging that Ford routinely solicited reaffirmation agreements, failed to file them with the court, and

-27-

(notwithstanding that such agreements are unenforceable) used them to collect substantial sums from members of the purported class. Debtors argued, *inter alia*, that §524 impliedly creates a private right of action for violation of that provision and, alternatively, that §524 is enforceable through §105.

The Sixth Circuit applied the four-factor test of *Cort v. Ash* (as modified by *Touche Ross*, 442 U.S. at 575) and held that §524 does not impliedly create a private right of action. As for §105, the Court questioned the breadth of the holding in *Bessette*, i.e., that §524 could be enforced by a district court through §105 without bringing a contempt proceeding in the bankruptcy court. The Sixth Circuit referenced its earlier (unpublished) ruling in *Kelvin v. Avon Printing Co., Inc.*, 1995 WL 734481 (6th Cir. 1995) (i.e., that §105 cannot be invoked to remedy breaches of §363) and held:

> To the extent that *Bessette* may be in tension with *Kelvin*, we adhere
> to the latter case. Section 105 undoubtedly vests bankruptcy courts
> with statutory contempt powers, but it "does not authorize the bankruptcy
> courts to create substantive rights that are otherwise unavailable under
> applicable law ... ."

*Pertuso*, 233 F.3d at 423 (quoting from *U.S. v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986)).

These issues were presented to the Seventh Circuit in *Cox v. Zale Delaware, Inc.*, 239 F.3d 910 (7th Cir. 2001). In *Cox*, a former Chapter 7 debtor who had signed a reaffirmation agreement that was never filed with the court brought a purported class action in the district court, long after his bankruptcy case was closed. The suit sought rescission of the agreement and restitution of all amounts paid to the secured creditor after discharge. The district court referred the suit to the bankruptcy court, which ultimately dismissed the action on the ground that §524(c) does not create a private right of action. *Id.* at 912-13. The district court affirmed that dismissal.

On appeal, the Seventh Circuit noted that both the district and bankruptcy courts in *Cox*, as well as the Sixth Circuit in *Pertuso*, had inappropriately emphasized that the Supreme Court is

reluctant to imply private rights of action in federal statutes. *Cox*, 239 F.3d at 913. The Seventh Circuit found that emphasis "misplaced" because the "private rights of action that the [Supreme] Court is reluctant to read into federal statutes are rights to obtain damages for statutory violations remediable by public agencies." *Id.* at 913-14. Cox was not seeking damages, and §524(c) is enforceable only by private parties. *Id.* at 914.

The Court then noted that a statute (such as §524(c)) that makes a contract void and unenforceable renders the contract rescindable, and rescission can be had even after full performance on both sides (Cox having already paid the secured creditor in full). *Id.* The Court nonetheless found the rescission remedy "hokey," characterizing Cox's action as both a frivolous and a nuisance suit.[32] It went on to conclude that a contempt proceeding in the bankruptcy court that issued the discharge injunction was the sole remedy for violation of §524(c),[33] "agreeing with the result in *Pertuso* though without endorsing its analysis of private rights of action." *Cox*, 239 F.3d at 917.[34] *See also In re Joubert*, 411 F.3d 452, 455-56 (3d Cir. 2005) (sole remedy for alleged §506(b) violation was contempt proceeding in bankruptcy court, and not private right of action under §105(a), agreeing with "decisions holding that § 105(a) does not authorize separate lawsuits as a remedy for bankruptcy

---

[32]    The remedy was "frivolous" (since the payments Cox sought to recoup were actually voluntary, "having only to do with the debtor's desire to retain his property and nothing to do with an unenforceable promise to pay") and had only nuisance value (since its net expected worth to Cox was negative). *Cox*, 239 F.3d at 915-16.

[33]    The Court reminded, however, that if Cox had been sued by the secured creditor before he had paid the debt in full, he could have interposed §524(c) as a defense, as an alternative to seeking contempt sanctions in the bankruptcy court (provided that he was prepared to lose the property in foreclosure). "But once he has paid the debt in full and is not in jeopardy of being sued, affirmative relief can be sought only in the bankruptcy court that issued the discharge." *Cox*, 239 F.3d at 917.

[34]    The Court considered the "remedial scheme of section 524 itself," noting that a contempt proceeding in the bankruptcy court (i.e., the "remedy *authorized* by section 524(a)(2))" had the advantage of placing responsibility for enforcement of the discharge order in the issuing court. If the creditor's breach of the filing requirement of §524(c) was deliberate, he could be held in contempt and restitution (of any payments made involuntarily) could be ordered, together with a reasonable attorney's fee. *Cox*, 239 F.3d at 915-16.

violations"); *Walls*, 276 F.3d at 506 (violations of §524 may not be independently remedied through §105 absent contempt proceeding in bankruptcy court).

The Seventh Circuit in *Cox* did not specifically discuss §105 or whether it can serve as the basis for a separate and independent suit to enforce other provisions of the Code.[35]  However, the Court has made it clear in many other decisions, including the *Kmart* opinion itself, that the equitable power granted by §105 is limited; it is a power to implement rather than override and does not give a bankruptcy judge "'free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness ... .'"  *Kmart*, 359 F.3d at 871 (quoting from *In re Chicago, Milwaukee, St. Paul & Pacific R.R.*, 791 F.2d 524, 528 (7ᵗʰ Cir. 1986)).  In *In re Fesco Plastics Corp., Inc.*, 996 F.2d 152 (7ᵗʰ Cir. 1993), the Court stated that §105(a)

> delineates the limited equitable power of bankruptcy courts ... .  Under [§105(a)], a court may exercise its equitable power only as a means to fulfill some *specific* Code provision. ... see *In re Lapiana*, 909 F.2d 221, 224 (7ᵗʰ Cir. 1990) ("We deprecate flaccid invocations of 'equity' in bankruptcy proceedings.").

*Fesco Plastics*, 996 F.2d at 154 (emphasis added; certain citations omitted).  "By the same token," however, when a specific section "addresses an issue, a court may not employ its equitable powers to achieve a result not contemplated by the Code."  *Id.* (citations omitted).

The Court explained these principles in *Disch v. Rasmussen*, 417 F.3d 769 (7ᵗʰ Cir. 2005).  There, the bankruptcy court had revoked a discharge order, even though the debtor's conduct did not meet the grounds for revocation specifically enumerated in §727(d).  The bankruptcy court relied on its equitable authority under §105(a), finding that revocation was necessary to prevent manifest injustice and to carry out the primary provisions of the Code, particularly §727(a) (specifying the

---

[35]     The Court merely observed that a bankruptcy judge's power to determine civil contempt "is explicitly conferred by Fed.R.Bankr. 9020(b)," adding a "see also" reference to § 105.  *Cox*, 239 F.3d at 916-17.  It also noted that "[a] court retains jurisdiction to enforce its injunctions."  *Id.* at 917.

grounds for denial of discharge). The court relied in the alternative on Bankruptcy Rule 9024, on the theory that the discharge had resulted from the court's own mistake. *Id.* at 774.

The Seventh Circuit, though affirming on the basis of Rule 9024, rejected the bankruptcy court's reliance on §105(a). The Court explained that despite the "open-ended language" of that section, there are limited circumstances in which it should be used:

> Otherwise, there is a real risk that more particular restrictions found throughout the Code would amount to nothing, because the court could always use the residual equitable authority of § 105(a). For that reason, this court has ... warned that a judge does not have "free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be" ... .
>     ...
> The bankruptcy court here took the position that ... it was acting to enforce a specific Code provision, § 727(a), not to achieve a reshuffling of the equities in a manner contrary to the provisions of the Code. But this ignores the fact that Bankruptcy Rule 4004 structures the way in which a claim under § 727(a) must be presented. If § 105(a) offered a way around [those] restrictions, then the rule might as well not exist. Similarly, such a broad interpretation of § 105(a) would make the list of grounds for revoking a discharge found in § 727(d) meaningless; anything not in the list could come in through the back door of § 105(a).

*Id.* at 777 (citations omitted). For these and other reasons, it is widely recognized that §105(a) "does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code ... ," 2 Collier on Bankruptcy ¶105.01[2] (15th ed. rev. 2005), and does not constitute "a roving commission to do equity." *U.S. v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986); *see also In re Jamo*, 283 F.3d 392, 403 (1st Cir. 2002) (§105 does not provide "a roving writ").

Here, §§549 and 550 provide a remedy for the recovery of post-petition transfers that meet the specifications set forth by Congress. There is no indication of any intent to authorize another remedy for recovery under §105(a). To hold that such a separate and independent action exists under §105(a) would amount to a clear act of legislation by this court. Again, as succinctly stated by the

Seventh Circuit, §105(a) "is a means to enforce the Code rather than an independent source of substantive authority." *In re UAL Corp.*, 412 F.3d 775, 778 (7th Cir. 2005) (citing *Kmart*, 359 F.3d at 871).

Indeed, Kmart acknowledges that §105 is not a source of substantive rights but urges that it is invoked here merely to "implement relief that might be available under Sections 549 and 550 ... or to implement the Seventh Circuit's ruling in *Capital Factors.*" (*See* Kmart Brief, at 21; January 31, 2005 transcript, at 68).

As for §§549 and 550, Kmart needs no assist from §105; together these two sections provide a comprehensive remedy for obtaining the "avoidance" (§549) and "recovery" (§550) of postpetition transfers.

As for "implementation" of the Seventh Circuit's decision, it is not at all clear what Kmart means. The Seventh Circuit did not remand the critical vendor "contested matter"[36] for further proceedings implementing its decision. Indeed, it is interesting to note that although the district judge stated that he was "remand[ing] for further proceedings consistent with [his] opinion," *Capital Factors*, 291 B.R. at 824-25,[37] a Seventh Circuit motions panel characterized the 'remand' label a "misnomer." In an order denying Capital Factors' motion to dismiss the appeal for lack of a "final" order (based on the 'remand' language), the motions panel stated:

> [T]he district judge did not direct the bankruptcy judge to conduct any further

---

[36]     The proceeding initiated by Kmart's filing of the Critical Vendor Motion was a "contested matter" within the purview of Fed.R.Bankr.P. 9014. Although a contested matter is not a separate lawsuit requiring service of a summons and complaint, it is governed by many of the same procedural rules that govern adversary proceedings (which, in turn, incorporate many of the Federal Rules of Civil Procedure).

[37]     The district judge, unconvinced that the bankruptcy court lacked power to simply order the moneys returned, stated: "It is not evident that Kmart will have to sue to recover the payments, and in fact, Kmart cites no cases indicating that the bankruptcy court would not have the power to order the return of the monies paid." *Capital Factors, Inc. v. Kmart Corp.* 291 B.R. 818, 824 (N.D.Ill. 2003), *aff'd*, 359 F.3d 866 (7th Cir. 2004).

-32-

> proceedings concerning the validity of the payments made to the critical vendors. ...
>
> The district judge's use of "remand" appears to be a misnomer. [He] recognized that the bankruptcy is ongoing, and that the disapproval of these payments would have consequences, such as the filing of adversary proceedings to recover the payments as preferential transfers. Strictly speaking, however, the recognition that one judicial ruling will lead to the commencement of new litigation (and each adversary proceeding is effectively a separate lawsuit) does not make a decision non-final. Unless there is something more to do in *this* contested matter, the district judge's decision brings to a close a discrete phase of the bankruptcy. And, as far as we can see, this contested matter is over.

*See* Order of May 30, 2003, at 2 (emphasis in original).[38] This court's ruling on Capital Factors'

emergency motion to stay the confirmation hearing was essentially to the same effect, i.e., that the

district judge did not remand for further proceedings in the critical vendor contested matter. (*See*

April 14, 2003 transcript, at 223-24). Nothing has transpired in the interim to change this court's

view.

If Kmart is instead referring to "implementation" of the Seventh Circuit's decision via a new

and independent action (which of course it must be, since these are all adversary proceedings), then

in addition to the inherent difficulties discussed above concerning independent suits under §105,

Kmart simply fails to provide any clues as to what that action might be,[39] - - much less whether it was

even retained in Kmart's plan of reorganization.

Accordingly, the court concludes for all the foregoing reasons that Count II should be

dismissed for failure to state a claim upon which relief may be granted.

---

[38]    The panel noted that "[l]ike any other decision by a motions panel, ... this resolution [would be] open to reconsideration at the merits stage if additional circumstances bearing on its resolution [came] to light." *Id.*

[39]    Movants posit that Kmart may be attempting to assert some sort of unjust enrichment claim, since it alleges in Count II that it would be "inequitable" for Movants to retain their payments in light of the Seventh Circuit's decision. Kmart has made clear, however, that it is "not seek[ing] recovery ... under a state-law 'unjust enrichment' theory ... ." *See* Kmart Brief, at 21, n. 12.

**The Doctrine of Judicial Estoppel.**

Movants contend that dismissal of the Critical Vendor Adversaries is required under the doctrine of judicial estoppel, and they assert essentially two arguments in support. First, they urge that because Kmart successfully asserted in its Critical Vendor Motion that payment of the Critical Vendor Claims was "vital" to its successful reorganization, Kmart's current attempt to secure avoidance and recovery of those payments constitutes a "clearly inconsistent" position. Movants state, *inter alia*: "Kmart alleged that it needed the benefits from its Critical Vendor Motion to reorganize, a position it may not now renounce." (*See* Chicago Sun-Times Brief, at 23-24). According to Movants, Kmart now asserts an "opposite" position in order to gain an unfair advantage through "double recovery," having already received the benefit of the favorable credit terms provided by Movants (and Movants having foregone opportunities to favor other customers or exercise other rights as creditors). *Id.*

Second, Movants contend that Kmart is barred from asserting that recovery of the Critical Vendor Payments will "benefit" the estate (as required under §550 of the Bankruptcy Code), because Kmart "admitted" in its Disclosure Statement that "waiver of avoidance actions was of greater benefit to the estate than any recovery that might be generated from the prosecution of the avoidance actions." (*See, e.g.*, Washington Post Brief, at 7-8). With respect to this second argument, Movants also contend, more generally, that Kmart seeks "to either renounce or forget the representations made to creditors and this Court throughout the bankruptcy case." *Id.* at 9. According to Movants, any argument that recovery will benefit the estate is "clearly inconsistent with the position [Kmart] advanced in the Disclosure Statement, at the Confirmation Hearing and throughout its entire

-34-

bankruptcy case, including at the hearing [on the Critical Vendor Motion]." *Id.* at 8-9.

The Supreme Court had occasion to elaborate upon the purpose and contours of the judicial estoppel doctrine in *New Hampshire v. Maine*, 532 U.S. 742, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). There, the State of New Hampshire brought an action against the State of Maine, seeking to establish a portion of the interstate boundary in the Piscataqua River region. In a prior dispute between the two states over lobster fishing rights in 1977, the Court had entered a consent judgment fixing the "lateral marine boundary" in that region, i.e., the boundary in the marine waters off the coast of the two states, from the "closing line of Portsmouth Harbor" seaward, in a southeasterly direction. *Id.* at 746. In the later litigation, New Hampshire sought to establish the *inland* river boundary, i.e., from the mouth of Portsmouth Harbor westward to the river's headwaters. *Id.* A 1740 decree by King George II had located the Piscataqua River boundary at the "Middle of the River." In the 1977 litigation, the parties agreed that this term meant the middle of the river's main channel of navigation, and the Court (declining to adopt a Special Master's report that rejected the parties' view in favor of the geographic middle) approved the states' proposed interpretation based on the facts and the law and directed entry of the consent decree. *Id.* at 747, 752. In the later litigation concerning the *inland* river boundary, the State of New Hampshire argued for a different meaning of "Middle of the River" - - one which would place the boundary along the Maine shore, thereby giving New Hampshire sovereignty over the entire river and all of Portsmouth Harbor. *Id.* at 747-48.

The Court held that New Hampshire was barred by the doctrine of judicial estoppel from asserting the contrary position. Under that doctrine, a party who "'assumes a certain position in a legal proceeding, and succeeds in maintaining that position, ... may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who

has acquiesced in the position formerly taken by him.'" *Id.* at 749 (quoting from *Davis v. Wakelee*,

156 U.S. 680, 689, 15 S.Ct. 555, 39 L.Ed. 578 (1895)).  The Court noted that while it had not had

occasion previously to discuss the doctrine elaborately, other courts had uniformly recognized that

> its purpose is "to protect the integrity of the judicial process," *Edwards v. Aetna
> Life Ins. Co.*, 690 F.2d 595, 598 (C.A.6 1982), by "prohibiting parties from de-
> liberately changing positions according to the exigencies of the moment." *United
> States v. McCaskey*, 9 F.3d 368, 378 (C.A.5 1993).  See ... *Scarano v. Central R.
> Co.*, 203 F.2d 510, 513 (C.A.3 1953) (judicial estoppel prevents parties from
> "playing 'fast and loose with the courts'" ...).  Because the rule is intended to
> prevent "improper use of judicial machinery," ... judicial estoppel "is an equitable
> doctrine invoked by a court at its discretion." ...

*New Hampshire*, 532 U.S. at 749-50 (certain citations omitted).  Although the circumstances under

which the doctrine may be invoked are "probably not reducible to any general formulation of

principle," several factors "typically inform the decision."  *Id.* at 750 (internal quotation marks and

citations omitted).  First, the later position must be "clearly inconsistent" with the earlier position.

*Id.* (citing, *inter alia, United States v. Hook*, 195 F.3d 299, 306 (7th Cir. 1999)).  Second, courts

inquire whether the party to be estopped succeeded in persuading the first court to accept its earlier

position, "so that judicial acceptance of an inconsistent position in a later proceeding would create

'the perception that either the first or the second court was misled'" (thereby posing a threat to judicial

integrity).  *Id.* at 750-51 (quoting from *Edwards*, 690 F.2d at 599).  The third factor is whether the

party asserting an inconsistent position would gain an unfair advantage or impose an unfair detriment

on the other party if not estopped.  *Id.* at 751 (citations omitted).

Applying these factors, and guided by the purpose of the doctrine, the Court found that equity

required barring New Hampshire's inconsistent position concerning the definition of "Middle of the

River."  The Court stated:

> Having convinced this Court to accept one interpretation of "Middle of the River,"
> and having benefited from that interpretation, New Hampshire now urges an incon-
> sistent interpretation to gain an additional advantage at Maine's expense. Were we
> to accept New Hampshire's latest view, the "risk of inconsistent court determina-
> tions" ... would become a reality. We cannot interpret "Middle of the River" in the
> 1740 decree to mean two different things along the same boundary line without
> undermining the integrity of the judicial process.

*Id.* at 755 (citations omitted).[40]

The Seventh Circuit, addressing a judicial estoppel contention pre-*New Hampshire* in *Ogden*

*Martin Systems of Indianapolis, Inc. v. Whiting Corp.*, 179 F.3d 523 (7th Cir. 1999), espoused a

comparable view of the purpose and contours of the doctrine. There, Ogden had entered into a

contract with Whiting whereby Whiting was to construct, deliver, and assemble two cranes at

Ogden's premises. Several years after the installation, an accident at Ogden's plant revealed

construction defects, resulting in substantial damage. Ogden, however, waited almost six years before

filing a diversity suit in federal court, and Whiting moved to dismiss based on the Indiana UCC's

four-year statute of limitations for transactions involving the sale of goods. In response, Ogden

contended that the construction of the cranes constituted an improvement to real property (giving rise

to a longer statute of limitations) and that Whiting should be judicially estopped in any event from

claiming that the contract was a transaction in goods. In a prior unrelated suit, Whiting had argued

that a plaintiff, injured by a Whiting crane installed by a third party more than twenty years earlier,

was subject to the Illinois ten-year statute of repose for injuries arising from improvements to realty.

In affirming the district court's dismissal of the suit, the Seventh Circuit first noted:

Judicial estoppel serves "to protect the courts from being manipulated by

---

[40]     Rejecting New Hampshire's suggestion that the parties had merely settled the prior litigation
through the consent decree without the judicial endorsement necessary to give rise to judicial estoppel, the Court
noted, *inter alia*, that it had made a determination in the prior suit that "[t]he consent decree 'reasonably invest[ed]
imprecise terms with definitions that give effect to [the 1740] decree' ... ." *New Hampshire*, 532 U.S. at 752-53.

chameleonic litigants who seek to prevail, twice, on opposite theories." *Levinson v. United States*, 969 F.2d 260, 264 (7th Cir. 1992); *see also Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998) ( "[T]he purpose of the doctrine ... is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant.").

*Ogden*, 179 F.3d at 527; *see also Chevariat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428 (7th Cir. 1993) (while alternative pleading is permitted, party cannot "equivocate" after first suit goes to judgment; doctrine thus "raises the cost of lying" by forcing party to choose one position irrevocably). The Court then considered: 1) whether the later position was clearly inconsistent; 2) whether the facts at issue were the same in both cases; and 3) whether the party to be estopped had convinced the first court to adopt its position. *Id.*

Although the contracts in both cases predominantly involved transactions in goods, the Seventh Circuit found that Whiting's position was not clearly inconsistent with its position in the earlier suit, articulating the difference as follows:

> The simple fact that the present suit requires a determination of whether a contract between a buyer and a seller involved a transaction in goods and the [prior] court ... was required to make a legal determination regarding the nature of a crane twenty years after its installation (largely without reference to the contractual relationship ...) provides a sufficient ground to distinguish the positions taken by Whiting in these cases.

*Id.* at 528. The Court went on to note that while judicial estoppel serves to prevent manipulative parties from prevailing twice on opposite theories, it should not be used to "hamstring a litigant" when his current position is not "clearly inconsistent with a prior position or when the facts of the two cases at issue are not identical." *Id*; *see also Ezekiel v. Michel*, 66 F.3d 894, 904-05 (7th Cir. 1995) (government's prior successful contention that fully-trained, private physicians working under contract with government agencies were independent contractors was not inconsistent with later

contention that resident physician completing specialty medical training at VA hospital was federal

employee); *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1548-49

(7th Cir. 1990) (prior successful contention that limousine company's dispatcher never *obtained* an

ownership interest in company was consistent with later contention that dispatcher had been *promised*

such an interest; however, prior successful contention that company had not authorized and did not

*know* about dispatcher's competing side business was inconsistent with later claim in securities fraud

suit based on failure of company's principals to *disclose* such business).

The Seventh Circuit made it clear in *In re Cassidy*, 892 F.2d 637, 641-42 (7th Cir. 1990), that

the doctrine of judicial estoppel applies to questions of law as well as fact. There, an attorney charged

with filing fraudulent tax returns had urged the Court, in an earlier appeal from a Tax Court judgment,

to decide whether his tax obligations had been discharged in bankruptcy. The Seventh Circuit

acquiesced and addressed the issue, but ruled that the taxes were nondischargeable. *Id.* at 639. The

attorney then filed a complaint in the bankruptcy court seeking a new ruling on dischargeability,

contending that the Tax Court had been without jurisdiction to determine the scope of the discharge.

*Id.* On appeal from a dismissal of that complaint, the Seventh Circuit held that while its prior ruling

of nondischargeability had no preclusive effect,[41] the attorney was nonetheless barred from relitigating

the issue on grounds of judicial estoppel. *Id.* at 640-41. Emphasizing that the doctrine is intended

to prevent the perversion of the judicial process, the Court explained that the attorney would not be

allowed to urge the Court to address the issue of dischargeability and then, after an adverse ruling,

argue in a later appeal that it should not have been addressed. *Id.* at 641. The Court explained:

Cassidy's maneuverings were clearly intended to delay the inevitable day of

---

[41]    The Court explained that since the Tax Court was indeed without jurisdiction to determine
dischargeability, the appellate court's discussion of it was necessarily dictum.

> reckoning, and in maneuvering he is trying to whipsaw this court. That is exactly
> the evil that the doctrine of judicial estoppel was meant to avoid.

*Id.* The Court cautioned, however, that the doctrine is equitable in nature, and it should therefore not

be used

> where it would work an injustice, such as where the former position was the
> product of inadvertence or mistake, *Hamilton v. Zimmerman*, 37 Tenn. (5
> Sneed) 39, 48 (1857); *Johnson Serv. Co. v. TransAmerica Ins. Co.*, 485 F.2d
> 164, 175 (5th Cir. 1973) ("the rule looks toward cold manipulation and not an
> unthinking or confused blunder"); or where there is only an appearance of
> inconsistency between the two positions but both may be reconciled.

*Id.* at 642 (certain citations omitted). In *Chevariat*,11 F.3d at 1428, for example, where the later

position may have been based on new information, the Court stated: "At least where there is no issue

of double recovery ..., if the court in the second suit is satisfied that the position adopted in the first

suit was clearly wrong yet had been advanced in good faith ..., the court is not required to apply the

doctrine of judicial estoppel."

This latter point is nicely illustrated by the Seventh Circuit's post-*New Hampshire* decision

in *Jarrard v. CDI Telecommunications, Inc.*, 408 F.3d 905 (7th Cir. 2005). Though "likely" dictum,

*see id.* at 914, the Court's discussion is pointedly relevant here. Jarrard had been injured while on

the job, and although he was treated for some of his injuries, he did not receive certain additional

treatments and therapy that his employer (and the employer's third party administrator) believed were

unnecessary. *Id.* at 907-08. Ultimately, his employer applied to the Indiana Worker's Compensation

Board for an adjustment of claim, seeking to foreclose additional benefits, and Jarrard soon thereafter

filed his own application with the Board. *Id.* at 908.

Years later, Jarrard filed with the Board a third-party complaint sounding in tort, alleging,

*inter alia*, that his employer and the third party administrator had acted in bad faith in seeking an

-40-

adjustment of his claim before the Board. *Id.* The relevant Indiana statute in effect at the time the complaint was filed granted the Board exclusive jurisdiction over independent tort claims relating to the adjustment of claims process. However, the acts giving rise to Jarrard's third-party complaint had occurred prior to the statute's effective date. The defendants filed a motion to dismiss, contending that because the statute did not apply retroactively, the Board did not have jurisdiction over the third party complaint (i.e., Jarrard would have to file suit in state court). The Board agreed, dismissing the third party claim, and ultimately entered a final worker's compensation award. *Id.*

Several years later, Jarrard filed a diversity suit in federal court against the same defendants, alleging tortious acts in the adjustment of claims process. This time, the defendants moved to dismiss on the basis of a position diametrically opposed to the one they had taken before the Board, i.e., that only the *Board* has jurisdiction of such suits. *Id.* at 909. In the interim, two Indiana appellate courts had held that the statute granting the Board exclusive jurisdiction was indeed to be applied retroactively, *id.* at 909-10 (citing *Samm v. Great Dane Trailers*, 715 N.E.2d 420 (Ind. Ct. App. 1999); *Borgman v. State Farm Ins. Co.*, 713 N.E.2d 851 (Ind. Ct. App. 1999)); accordingly, the defendants contended that Jarrard could only bring his suit before the Board - - and not as a diversity action in federal court. *Jarrard*, 408 F.3d at 909. The district court granted the motion to dismiss, and the Seventh Circuit affirmed.

In evaluating Jarrard's judicial estoppel contention, the Court discussed four factors that are relevant to the inquiry, i.e., whether the later position is clearly inconsistent, whether the party prevailed on the earlier position, whether the party would gain an unfair advantage or impose an unfair detriment on the other party if not estopped, and whether the operative facts remain the same. *Id.* at 914-15. The Court noted that "considering these factors alone," Jarrard's judicial estoppel

argument seemed fairly persuasive. *Id.* at 915. However, when viewed in light of "the strong

antifraud purposes animating the doctrine," judicial estoppel was clearly inapplicable:

> ... [T]he position the defendants took before the Board - - that the Board did
> not have jurisdiction because the statute was not retroactive - - was a fair read-
> ing of the statute. The defendants were well within their rights to advocate
> this interpretation in good faith, and the Board agreed with that interpretation.
> The law changed in the interim ... . As a consequence, the defendants argued
> a position in federal court opposite from the one taken before the Board. There
> is nothing fraudulent or otherwise untoward about this shift, even though the
> results ended up being favorable to the defendants in each instance.
>
> ... [T]he defendants' change in position resulted from circumstances outside
> their control - - namely, a change in controlling state law. ...
>
> In sum, the defendants' arguments, though facially inconsistent, were not an
> attempt to play "fast and loose" with the court, and thus the broad antifraud
> purpose of judicial estoppel does not come into play here.

*Id.*

It is clear from the foregoing precedents that the doctrine of judicial estoppel has no

application in the present case. In fact, Movants' contentions founder on the very first factor, i.e., the

existence of a clear inconsistency between Kmart's current and former positions. Movants direct the

court's attention to Kmart's statements in the Critical Vendor Motion that payment of the Critical

Vendor Claims was "vital" to its successful reorganization (*see* Chicago Sun-Times Brief, at 20-21);

yet Movants point to nothing inconsistent - - much less "clearly inconsistent" - - in the current suit.

Instead, they vaguely assert that Kmart seeks to "renounce" its earlier position. *Id.* at 24. Movants'

obvious inability to articulate the purportedly inconsistent position with any greater specificity is

understandable; Kmart has not alleged, or even intimated, that the Critical Vendor Payments were

anything but essential to its reorganization effort. Indeed, Kmart would have no reason to make such

an allegation in the present suit, because it would be wholly irrelevant to an action under §549, which

merely requires that the payments, whether vital or not, be unauthorized.

Movants, unable to pinpoint an inconsistent *position* in the present suit, resort to arguing that

the recovery actions *themselves* are inconsistent with Kmart's prior assertions on the Critical Vendor

Motion. (*See, e.g.*, Chicago Sun-Times Brief, at 22 ("Kmart's Recovery Actions Are Clearly

Inconsistent ... ")) They appear to contend that the inconsistency lies in the mere pursuit of the

payments, regardless of the basis of the new action or any position taken therein.[42] There may be

situations where the mere filing of an action may be barred by judicial estoppel, as in *Patriot

Cinemas, Inc. v. General Cinema Corp.*, 834 F.2d 208 (1st Cir. 1987), where a party was estopped

from prosecuting a cause of action that it had previously persuaded a court it would not pursue. This

is not such a situation. Kmart, in obtaining entry of the Critical Vendor Order, did not assert that it

would forego a later recovery action under §549; indeed, the order had not even been *entered* yet,

much less appealed and reversed. Moreover, there is no inconsistency between Kmart's prior

assertions that the payments were necessary and that such an order was authorized by statute, and its

current request - - after reversal of that order - - for recovery of the payments as not authorized by the

court.[43]

---

[42]     *See also* January 31, 2005 Transcript, at 78 (where Movants' counsel states: "[T]he whole concept
*of the suit* is give us that money back which we promised you, Your Honor, through our motion and through our
witness was necessary. What can be more of a repudiation?" (emphasis added))

[43]     Movants also point to Kmart's use of the word "inequitable" in Count II of Kmart's complaint,
which seeks recovery under § 105. As discussed above, that count is being dismissed for failure to state a claim
upon which relief may be granted. The court nonetheless notes that Kmart's use of the term "inequitable" does not
give rise to any inconsistency with Kmart's former position on the Critical Vendor Motion, and Movants again fail to
describe the purported inconsistency. Kmart merely alleges that "[s]ince the [Critical Vendor Order] has been
reversed, it would be contrary to the Bankruptcy Code and inequitable for Defendant to be permitted to retain the
Payment ... ." The allegation is premised on the reversal of the order, an event transpiring after the Critical Vendor
Hearing, and is in no way inconsistent with Kmart's prior assertions that the vendors were vital to its reorganization
effort.

Accordingly, even though Kmart prevailed at the Critical Vendor Hearing,[44] the doctrine of

judicial estoppel does not apply with respect to the assertions made and positions taken by Kmart in

obtaining entry of the Critical Vendor Order.

As for Movants' additional contention that Kmart is barred from asserting "benefit" to the

estate for purposes of recovery under §550 of the Bankruptcy Code, they fail once again to set forth

any "clear inconsistency." They rely largely on the following excerpt from Kmart's Disclosure

Statement concerning the Plan's waiver of preference and other avoidance claims:

> Although such waiver entails the release of the value of potential preference
> recoveries, the Debtors believe that the reorganized business will derive more
> value in the form of, among other things, go-forward credit support from trade
> vendors and service providers, than if the Debtors retained and prosecuted
> Avoidance Claims. This go-forward value inures to the benefit of all creditors
> under the Plan insofar as solid trade credit support will assist in improving cash
> flow and cementing business relationships which enhance the value of the
> reorganized enterprise as a whole. The Debtors therefore believe that waiver
> of the Avoidance Claims is in the collective best interests of all stakeholders.

(Disclosure Statement, at 103). According to Movants, Kmart's current claim that recovery of the

Critical Vendor Payments will benefit the estate is inconsistent with its previous representation that

Kmart would benefit more from waiving "Avoidance Claims," thereby ensuring the "go-forward

credit support" of its vendors.

While the above passage makes reference not only to the release of preference recoveries but

---

[44]     While Kmart's "winning" the right to pay *out* of its coffers nearly $300 million as a result of the
Critical Vendor Hearing might well seem like a Pyrrhic victory, it nonetheless constitutes "prevailing" for purposes
of applying the judicial estoppel doctrine, even though the Critical Vendor Order was ultimately reversed. *See
Carnegie v. Household International, Inc.*, 376 F.3d 656, 660 (7th Cir. 2004); *see also Cassidy*, 892 F.2d at 641.
Kmart did succeed in persuading this court that the continued support of the vendors was vital to its reorganization
effort, and it received certain benefits as a result of the entry of the order, including continued provision of goods and
services on favorable terms. (It is worth noting, however, that while this constitutes "winning twice," it is hardly a
case - - as urged by Movants - - of *double* recovery. *See Chevariat*, 11 F.3d at 1427-28, suggesting that "double
recovery" involves the situation where a party has not only "won" (which appears to be all that is ordinarily required
in this regard for judicial estoppel purposes) but has already been fully compensated, and considering whether
judicial estoppel should be applied in that context even where inconsistent positions result merely from carelessness
or inadvertence.)

also to the waiver of "Avoidance Claims" (defined to include actions under §549), its primary thrust deals with preferences under §547 of the Bankruptcy Code. Indeed, the passage follows and concludes a lengthy discussion, analysis, and quantification of the estate's potential preference recoveries. Movants nonetheless urge that Kmart "enumerated the cost-benefit analysis it undertook" in deciding that waiver would yield more value to the estate (*see* Washington Post Brief, at 8); however, the financial analysis set forth in this section of the Disclosure Statement relates entirely to estimates of preference claims and defenses.

Moreover, Critical Vendor Payments were specifically addressed in another part of the Disclosure Statement. In the section describing the Critical Vendor Program, Kmart included a warning that it may pursue recovery of Critical Vendor Payments in the event that the Critical Vendor Order was reversed. (Disclosure Statement, at 23)

Finally, the court notes that Kmart's statements concerning *"more* value" from a waiver than from a prosecution of claims is consistent in any event with (and indeed acknowledges that) prosecution would provide some benefit to the estate. Under the circumstances, if there *is* an inconsistency lurking in Kmart's assertions of benefit, it is a far cry from the "clear inconsistency" contemplated by the doctrine of judicial estoppel.

More importantly, Kmart did not "prevail" with respect to the assertions made in its Disclosure Statement. It merely obtained entry of an order approving the Disclosure Statement "as containing adequate information within the meaning of Section 1125(a)" of the Bankruptcy Code. (*See* "Order Approving (I) Disclosure Statement; (II) Record Date, Voting Deadline and Procedures for Temporary Allowance of Certain Claims; (III) Procedures for Filing Objections to Plan; (IV) Solicitation Procedures for Confirmation; and (V) Hearing Date to Consider Confirmation of the

Plan" (the "Order Approving Disclosure Statement"), at 2). In obtaining that order, Kmart simply

persuaded the court that the Disclosure Statement met the informational standards of §1125; the order

did not constitute judicial endorsement of the many assertions made in the Disclosure Statement.

Movants similarly contend that Kmart's current assertion of benefit is inconsistent with the

position it advanced at the confirmation hearing,[45] and they cite to an exhibit to Kmart's Confirmation

Brief (setting forth in chart form the objections to confirmation and Kmart's responses), which

contains language nearly identical to the Disclosure Statement passage quoted above. For the reasons

just stated with respect to that passage, there is no inconsistency between Kmart's current assertions

of benefit and those made in the exhibit to its Confirmation Brief. And again, even *assuming* that

Kmart had argued at the confirmation hearing that it would benefit more from waiving than from

prosecuting Critical Vendor suits, it did not *prevail* with respect to any such assertion. Kmart never

obtained judicial endorsement of a plan waiving the right to bring the Critical Vendor Actions; Kmart

prevailed only *after* the plan was modified to retain that right.

It is clear, then, that consideration of the foregoing "factors" counsels against application of

the judicial estoppel doctrine in this case. Moreover, when those factors are evaluated in light of the

doctrine's purpose, its inapplicability becomes unmistakable. The "antifraud policy that animates the

doctrine" (*Carnegie*, 376 F.3d at 660) is not engaged here at all. Kmart has not tried to mislead the

court, "... 'deliberately changing positions according to the exigencies of the moment.'" *New

Hampshire*, 532 U.S. at 749. Its current position is based upon the reversal of the Critical Vendor

Order - - not upon "simple expediency." (*Jarrard*, 408 F.3d at 915).

Movants attempt to surmount this obvious problem by casting a sinister spin on Kmart's

---

[45]     Movants also make a sweeping reference to positions advanced "throughout [Kmart's] entire
bankruptcy case." They fail to provide, however, any specifics.

institution of the Critical Vendor Actions. Notwithstanding that these suits were filed by reorganized Kmart, whose shareholders include creditors that received stock under Kmart's Plan, Movants allege that recovery is sought by Kmart's "new owners" (Washington Post Brief, at 2, 3, and 5) "for their own benefit and that of one creditor," Capital Factors (Chicago Sun-Times Brief, at 1, 11). They assert that the new owners "have chosen to renege on the deals that Kmart made with its critical vendors in Kmart's darkest hour." (Chicago Sun-Times Brief, at 1). According to Movants, Kmart unscrupulously chose to sue rather than return to this court for an evidentiary hearing on the propriety of the Critical Vendor Payments.[46] Movants claim that the institution of these suits is nothing more than "opportunistic maneuvering" (Washington Post Brief, at 10), Kmart having filed them "[o]nly after receiving the benefits from the Critical Vendors' performance, including a successful reorganization .. ." (Chicago Sun-Times Brief, at 23)

It was not, however, "[o]nly after receiving the benefits" from Critical Vendors that Kmart filed these suits; it was after the Critical Vendor Order was reversed over a year later. It is not as though Kmart "envisag[ed] a succession of suits in which a change in position would be advantageous," *Carnegie*, 376 F.3d at 660, -- zealously seeking authority to make the Critical Vendor Payments while furtively planning to recoup them after appeal and reversal!

Even in *Jarrard*, where the defendants' position actually *was* clearly inconsistent -- indeed, the diametric opposite from that previously asserted -- the Court concluded that because of the interim change in the law, there was "nothing fraudulent or otherwise untoward" about the

---

[46]     Movants assert that Kmart could actually have sought another hearing in this court, after reversal of the Critical Vendor Order, to create a new evidentiary record in support of that order based on the "road map" purportedly laid out by Judge Easterbrook under §363. (January 31, 2005 Transcript, at 14, 17, 24, 78). Movants' assertion is patently meritless; the Seventh Circuit's decision that "the critical-vendors order cannot stand" concluded the Critical Vendor contested matter. *Kmart*, 359 F.3d at 874.

defendants' shift. *Jarrard*, 408 F.3d at 915. The Court explained:

> There is more to the doctrine than the prevention of the sort of flip-flop
> of which Jarrard complains. Judicial estoppel is intended to protect the courts
> from the litigatory shenanigans that would result if parties could, without
> limitation or consequence, swap litigation positions like hats in successive cases
> based on simple expediency or self-benefit. Judicial estoppel shields the courts
> from being the instrument of such misconduct.

*Id.*

There are no "litigatory shenanigans" here, Movants' unfounded innuendo to the contrary

notwithstanding. Kmart has filed actions that were specifically retained in its plan of reorganization.

While Movants regard such filing as "exploiting" the reversal of the Critical Vendor Order

(Washington Post Brief, at 9), Kmart regards it as implementing that reversal. (Kmart Brief, at 17,

21). These are, after all, the very recovery actions that the Seventh Circuit discussed in rejecting the

Critical Vendors' "mootness" contentions on appeal. *Kmart*, 359 F.3d at 869-70. Under the

circumstances, the filing of such suits can hardly be considered an "'improper use of judicial

machinery.'" *New Hampshire*, 532 U.S. at 749-50 (internal citations omitted).

Again, judicial estoppel is intended to prevent the perversion of the judicial process. There

is no perversion here. Indeed, application of the doctrine under the circumstances of this case would

itself amount to such a perversion.

## The Adequacy of the Retention Provision and of the Hearing Under Bankruptcy Rule 3019.

Movants contend that Kmart did not effectively retain the Avoidance Claims described in the

Plan Modification and that Movants are not bound by that modification in any event, but only by the

-48-

"express waiver" purportedly set forth in the Disclosure Statement and First Amended Plan.

Putting aside the fact that the First Amended Plan was never confirmed, there simply was no express waiver of the claims asserted in the Critical Vendor Actions. As indicated above, the Disclosure Statement advised that Kmart planned to waive its "Avoidance Claims" with certain exceptions. In that section concerning the waiver of Avoidance Claims and in justification therefor, the Debtors included a lengthy description of the analysis of potential preference recoveries under §547 of the Bankruptcy Code. Movants rely largely on that section of the Disclosure Statement, notwithstanding its focus on preferences, and ignore the section specifically addressing the Critical Vendor program, which was contained in an entirely different part of the Disclosure Statement. There, Kmart warned that if the Critical Vendor Order was reversed on appeal, the estates could hold claims for recovery of the Critical Vendor Payments. Under the circumstances, it can hardly be said that there was any waiver here - - whether express or implicit - - of the right to file the Critical Vendor Actions. *See, e.g., In re Midway Airlines, Inc.*, 383 F.3d 663, 671 (7th Cir. 2004) ("waiver is an intentional relinquishment of a known right").

As for Movants' contentions concerning the Plan Modification, the court first notes that §1127 of the Bankruptcy Code, which addresses modifications to a Chapter 11 plan, provides that the proponent of a plan may modify it at any time before confirmation. 11 U.S.C. §1127(a). If the modification is proposed after voting has been completed, then the acceptances or rejections will be deemed to apply to the plan as modified, unless the creditor changes his vote within a time fixed by the court. 11 U.S.C. §1127(d). If there is a resolicitation of votes, Bankruptcy Rule 2002 provides that creditors must be given twenty days' notice of the voting deadline. Fed.R.Bankr.P. 2002(a)(5).

Resolicitation, however, is not always required. Bankruptcy Rule 3019, which implements

§1127, provides as follows:

> In a chapter 9 or chapter 11 case, after a plan has been accepted and before
> its confirmation, the proponent may file a modification of the plan. If the court
> finds after hearing on notice to the trustee, any committee appointed under the
> Code, and any other entity designated by the court that the proposed modification
> does not adversely change the treatment of the claim of any creditor or the interest
> of any equity security holder who has not accepted in writing the modification, it
> shall be deemed accepted by all creditors and equity security holders who have
> previously accepted the plan.

As acknowledged by Movants, this rule provides a "safe harbor" exception to resolicitation if the

requirements set forth therein are satisfied. (*See* Chicago Sun-Times Brief, at 29). In other words,

if the court finds, after hearing on proper and adequate notice, that the modification does not

adversely change the treatment of claims, then resolicitation is not required.

This court so found at the confirmation hearing, in connection with its ruling on the

emergency motions and objections filed by Capital Factors and Dean Foods. As indicated above,

Capital, in seeking an adjournment of the confirmation hearing, had contended not only that the

district court's "remand" required the immediate entry of orders directing return of the Critical

Vendor Payments but also that a resolicitation of votes was required. According to Capital, the

additional cash that would be recovered in the Critical Vendor Actions required a resolicitation of

Class 5 creditors to allow them to reassess the provisions calling for distributions in common stock.

(Emergency Motion of Capital Factors, at 2). Dean Foods likewise sought an adjournment,

contending, *inter alia*, that the Plan Modification adversely changed the treatment of the Critical

Vendor Claims and that the court therefore "should not deem the Plan as accepted by all creditors

who previously accepted the Plan until after notice and hearing." (Emergency Motion of Dean Foods,

at 4). Dean further contended that sufficient notice of any adverse change hearing under Rule 3019